UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GAIL FRIEDT, Derivatively on Behalf of TESARO, INC., | ) | Case No. |
| | ) | |
| Plaintiff, | ) | **VERIFIED STOCKHOLDER** |
| v. | ) | **DERIVATIVE COMPLAINT FOR** |
| | ) | **VIOLATION OF SECURITIES LAW,** |
| LEON O. MOULDER, JR., MARY LYNNE | ) | **BREACH OF FIDUCIARY DUTY,** |
| HEDLEY, TIMOTHY R. PEARSON, | ) | **WASTE OF CORPORATE ASSETS,** |
| DAVID M. MOTT, BETH SEIDENBERG, | ) | **AND UNJUST ENRICHMENT** |
| LAWRENCE M. ALLEVA, JAMES O. | ) | |
| ARMITAGE, EARL M. COLLIER, JR., | ) | **DEMAND FOR JURY TRIAL** |
| GARRY A. NICHOLSON, KAVITA PATEL, | ) | |
| and ARNOLD L. ORONSKY, | ) | |
| | ) | |
| Defendants, | ) | |
| -and- | ) | |
| | ) | |
| TESARO, INC., a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant TESARO, Inc. ("TESARO" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in billions

of dollars in damages to TESARO's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed TESARO to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      TESARO is a biopharmaceutical company that focuses on the development and commercialization of oncology-focused products and product candidates for cancer patients. Until recently, the Company never had a revenue-generating, commercially-available product on the market, and has long been heavily dependent on capital raised from investors to fund the research and development costs for its pipeline of drugs. The Company's ability to transition into long-term profitability is thus reliant on the successful commercialization of its products and achievement of a level of revenues adequate to support its cost structure.

3.      In December 2010, the Company entered into a license agreement with OPKO Health, Inc. ("OPKO"), a medical test and medication company, to obtain exclusive worldwide rights to research, develop, manufacture, market, and sell the drug "rolapitant," a proprietary P/neurokinin-1 ("NK-1") receptor antagonist.[1] The agreement calls for the Company to pay minimum royalty and development milestone payments worth tens of millions of dollars to OPKO during the first five calendar years of commercial sales.

4.      By acquiring this license to the drug rolapitant, the Company was able to develop its first commercial product, VARUBI® (rolapitant or "Varubi"). The drug purportedly works in combination with other antiemetic[2] agents in adults to prevent delayed nausea and vomiting

---

[1] "NK-1 receptor antagonist" refers to a class of medications or drugs with properties that prevent or reduce vomiting and nausea. Rolapitant, the drug's generic name, binds to and blocks the NK-1 receptor in the central nervous system that would otherwise induce nausea and vomiting caused in cancer patients receiving chemotherapy.

[2] "Antiemetic" refers to any drug that prevents or reduces vomiting and nausea.

associated with initial and repeat courses of emetogenic[3] cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The market for such a drug is potentially large in size and scope, with the Center for Disease Control and Prevention ("CDC") reporting that approximately 650,000 patients receive chemotherapy each year in an outpatient oncology clinic in the U.S.[4]  According to the Company, "[u]p to 50% of patients undergoing highly or moderately emetogenic chemotherapy experience delayed [chemotherapy-induced nausea and vomiting] (25 to 120 hours post chemotherapy) — even when prescribed" other anti-nausea medication.  The U.S. Food and Drug Administration ("FDA") approved the first iteration of Varubi, to be taken orally, in September 2015.  The Company also commenced commercial sales of an intravenous ("IV") formulation of Varubi after FDA approval in October 2017, Varubi IV.

5.      Since at least March 2016, the Individual Defendants (as defined herein) repeatedly and brazenly misrepresented the efficacy and safety of Varubi for all uses. Specifically, the Individual Defendants repeatedly misrepresented that Varubi had a safe profile, with minimal and easily managed side effects.  In reality, TESARO's public statements failed to report that Varubi had undisclosed safety risks to cancer patients.

6.      Issues concerning Varubi began to surface on January 12, 2018, when the Company issued a press release and letter to healthcare providers warning that Varubi causes anaphylaxis, anaphylactic shock, and other serious hypersensitivity reactions requiring hospitalization.  In a Dear Health Care Provider ("DHCP") letter, the Company vaguely indicated

_____

[3] "Emetogenic" refers to any agent having the capacity to induce vomiting, which is a common property of anticancer agents and narcotics.

[4] CDC, *Preventing Infections in Cancer Patients – Information for Health Care Providers*, https://www.cdc.gov/cancer/preventinfections/providers.htm (last visited June 19, 2018).

that "[h]ealthcare professionals must be vigilant for signs of hypersensitivity or anaphylaxis in all patients receiving VARUBI® (rolapitant) injectable emulsion, both during and following its administration."   On January 16, 2018, after the Martin Luther King, Jr. Day weekend, TESARO's stock price fell almost 6%, erasing over $221.3 million of the Company's market capitalization in the wake of the revelation of Varubi's serious side effects.

7.      After more than a month, the Company finally revealed the full extent of the fate of Varubi's marketability came to light on February 27, 2018.  The Company admitted that a package insert included in the package for Varubi that mentioned the adverse events, including anaphylaxis, anaphylactic shock, and serious hypersensitivity reactions, had limited the market opportunity of the drug.   In a stunning reversal of support for Varubi, TESACO pulled the products, stating that the Company would suspend marketing and distribution of Varubi IV.  The Company also acknowledged that it was seeking the possible out-licensing of Varubi, abandoning the drug altogether in favor of the Company's only other commercially available product at the time, ZEJULA®.

8.      To make matters worse, TESACO revealed in the Company's most recent Annual Report on Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 28, 2018 the Company expected that a vast majority of Varubi IV units shipped to customers in 2017 would be returned in 2018.  The inventory returns created an aggregate write-down of $18.7 million for the fiscal year ended December 31, 2017.   In the wake of these announcements, TESACO's stock plunged an additional 10%, on February 28, 2018; erasing over $334 million more of the Company's market capitalization.  Overall, the Company's stock has plummeted more than three-fourths of its value in little over a year, from $190.36 per share

on February 17, 2017 ahead of the FDA's approval of Varubi IV, to a low of $44.46 per share on May 30, 2018, a loss of nearly *$7.4 billion* in market capitalization.

9.     Further, defendants Leon O. Moulder, Jr. ("Moulder"), Mary Lynne Hedley ("Hedley"), Lawrence M. Alleva ("Alleva"), James O. Armitage ("Armitage"), Earl M. Collier, Jr. ("Collier"), David M. Mott ("Mott"), Garry A. Nicholson ("Nicholson"), Arnold L. Oronsky ("Oronsky"), Kavita Patel ("Patel"), and Beth Seidenberg ("Seidenberg") negligently made false and misleading statements in the Company's April 8, 2016 Proxy Statement on Form DEF 14A filed with the SEC (the "2016 Proxy").  The 2016 Proxy was filed ahead of the Company's Annual Meeting of Shareholders held May 11, 2016.  The 2016 Proxy included votes on the election of TESARO's ten-member Board of Directors (the "Board"), including defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg, as well as a stockholder vote for approval of an amendment to the 2015 Non-Employee Director Stock Incentive Plan (the "Director Incentive Plan"), affirming the reserve of 500,000 shares under the plan for themselves, worth $22 million in market value at that time.  In connection with these efforts, the above members of the Board misleadingly stated that they engaged in operational risk oversight and that the Audit Committee of the Board exercises oversight of the Company's financial statements.

10.     As a result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of Massachusetts on behalf of investors who purchased TESACO's shares.

11.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District, so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper under 28 U.S.C. §1391 because TESARO maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Gail Friedt was a stockholder of TESARO at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current TESARO stockholder.

**Nominal Defendant**

16.     Nominal defendant TESARO is a Delaware corporation with principal executive offices located at 1000 Winter Street, Waltham, Massachusetts.  TESARO is a commercial-stage biopharmaceutical company that develops treatments for solid tumors.  As of December 31, 2017, the Company had 715 full-time employees

**Defendants**

17.     Defendant Moulder is TESARO's Chief Executive Officer ("CEO") and a director and has been since March 2010.  Defendant Moulder co-founded TESARO in March 2010.  Defendant Moulder is named in a related securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Moulder knowingly, recklessly, or with gross negligence: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  Defendant Moulder also negligently made materially misleading statements in the Company's 2016 Proxy.  TESARO paid defendant Moulder the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2017 | $659,615 | $2,387,730 | $2,582,790 | $406,560 | $6,727 | $6,043,422 |
| 2016 | $639,385 | $2,169,500 | $2,392,230 | $449,280 | $5,453 | $5,655,848 |

18.     Defendant Hedley is TESARO's Chief Operating Officer ("COO"), and has been since July 2014, and President and a director, and has been since March 2010.  Defendant Hedley was also TESARO's Chief Scientific Officer from March 2010 to July 2014.  Defendant Hedley co-founded TESARO in March 2010.  Defendant Hedley knowingly, recklessly, or with gross negligence: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  Defendant Hedley also negligently made materially misleading statements in the Company's 2016 Proxy.  TESARO paid defendant Hedley the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2017 | $609,519 | $1,989,745 | $2,152,254 | $353,678 | $14,124 | $5,119,320 |
| 2016 | $584,462 | $1,735,600 | $1,913,784 | $411,723 | $12,781 | $4,658,350 |

19.     Defendant Timothy R. Pearson ("Pearson") is TESARO's Principal Accounting Officer and has been since November 2017, and Executive Vice President and Chief Financial Officer, and has been since May 2014.  Defendant Pearson is named in a related securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Pearson knowingly, recklessly, or with gross negligence: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  TESARO paid defendant Pearson the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2017 | $419,660 | $1,061,173 | $1,147,883 | $191,940 | $150,937 | $2,971,593 |
| 2016 | $402,058 | $759,325 | $837,281 | $210,014 | $34,688 | $2,243,366 |

20.     Defendant Mott is TESARO's Chairperson of the Board and has been since July 2011, and a director and has been since May 2010.  Defendant Mott knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  Defendant Mott also negligently made materially misleading statements in the Company's 2016 Proxy.  TESARO paid defendant Mott the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $101,000 | $995,526 | $1,096,526 |
| 2016 | $100,000 | $296,838 | $396,838 |

21.     Defendant Seidenberg is a TESARO director, and has been since June 2011. Defendant Seidenberg is also a member of TESARO's Audit Committee and has been since at least April 2015.   Defendant Seidenberg knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.   Defendant Moulder also negligently made materially misleading statements in the Company's 2016 Proxy.    TESARO paid defendant Seidenberg the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $60,000 | $995,526 | $1,055,526 |
| 2016 | $60,000 | $296,838 | $356,838 |

22.     Defendant Alleva is a TESARO director and has been since March 2012. Defendant Alleva is also the Chair of TESARO's Audit Committee and a member of that committee, and has been since at least April 2015.  Defendant Alleva knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  Defendant Alleva also negligently made materially misleading statements in the Company's 2016 Proxy.   TESARO paid defendant Alleva the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $70,000 | $995,526 | $1,065,526 |
| 2016 | $70,000 | $296,838 | $366,838 |

23.     Defendant Armitage is a TESARO director and has been since May 2013. Defendant Armitage knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate

- 9 -

disclosure controls and procedures with respect to TESARO's drug products. Defendant Armitage also negligently made materially misleading statements in the Company's 2016 Proxy. TESARO paid defendant Armitage the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $57,500 | $995,526 | $1,053,026 |
| 2016 | $57,500 | $296,838 | $354,338 |

24.     Defendant Collier is a TESARO director and has been since May 2014. Defendant Collier knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products. Defendant Collier also negligently made materially misleading statements in the Company's 2016 Proxy. TESARO paid defendant Collier the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $68,500 | $995,526 | $1,064,026 |
| 2016 | $67,500 | $296,838 | $364,338 |

25.     Defendant Nicholson is a TESARO director and has been since May 2015. Defendant Nicholson is also a member of TESARO's Audit Committee and has been since at least April 2016. Defendant Nicholson knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products. Defendant Nicholson also negligently made materially misleading statements in the Company's 2016 Proxy.  TESARO paid defendant Nicholson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $60,000 | $995,526 | $1,055,526 |
| 2016 | $60,000 | $296,838 | $356,838 |

26.     Defendant Patel is a TESARO director and has been since March 2016. Defendant Patel knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.  Defendant Patel also negligently made materially misleading statements in the Company's 2016 Proxy. TESARO paid defendant Patel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $60,000 | $995,526 | $1,055,526 |
| 2016 | $60,000 | $296,838 | $356,838 |

27.     Defendant Oronsky was a TESARO director from June 2011 to May 2018. Defendant Oronsky was also a member of TESARO's Audit Committee from at least April 2015 to at least April 2016.   Defendant Oronsky knowingly or recklessly: (i) caused or allowed TESARO to disseminated improper statements concerning Varubi's safety and efficacy; and (ii) failed to maintain adequate disclosure controls and procedures with respect to TESARO's drug products.   Defendant Oronsky also negligently made materially misleading statements in the Company's 2016 Proxy.   TESARO paid defendant Oronsky the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $50,000 | $995,526 | $1,045,526 |
| 2016 | $57,000 | $296,838 | $353,838 |

28.     The defendants identified in ¶¶17-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17, 18, 20-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21, 22, 25, 27 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶17-27 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29.     By reason of their positions as officers and directors of TESARO, each of the Individual Defendants owed and owe TESARO and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage TESARO in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of TESARO, and not in furtherance of their personal interest or benefit.

30.     To discharge their duties, the officers and directors of TESARO were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of TESARO.  By virtue of such duties, the officers and directors of TESARO were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about TESARO's business prospects, including the safety, efficacy, and commercial viability of Varubi;

(b)     conduct the affairs of TESARO in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting TESARO's assets, and to maximize the value of TESARO's stock; and

(c)     remain informed as to how TESARO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Pursuant to the Company's Code of Business Conduct and Ethics**

31.     TESARO's Code of Business Conduct and Ethics (the "Code") is purportedly intended to provide an outline of the Company's commitment "to honest and ethical conduct and adherence to the highest levels of integrity in service to patients, the medical community, colleagues and shareholders."  The Code applies to the Company's Board directors and officers. According to the Code, the Company requires all directors and officers to "act with the highest standards of personal and professional integrity."  The Code also mandates that directors and officers maintain integrity in public communications, providing "accurate, timely and understandable communications through public disclosures and regulatory findings."

**Additional Duties of the Audit Committee Defendants**

32.     In addition to these duties, the Audit Committee Defendants, defendants Alleva, Nicholson, Oronsky, and Seidenberg, owed specific duties to TESARO to assist the Board in overseeing the Company's financial reporting processes.  Under the Audit Committee's Charter, the Audit Committee Defendants must assist the Board "in fulfilling its oversight responsibilities with respect to the Company's compliance with accounting, regulatory and legal requirements." Moreover, the Audit Committee's Charter specifically tasked the Audit Committee with discussing "significant issues, events and transactions ... with management."  Additionally, the Audit Committee "shall assist the Board in its oversight of risk, which includes without limitation overseeing the management of financial risks" such as "cash investment strategy and results ... as well as the Company's systems of internal controls and disclosure controls and procedures."

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of TESARO, the absence of good faith on their part, and a reckless disregard for their duties to TESARO that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to TESARO.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, TESARO to misrepresent its business prospects, including with respect to the safety and efficacy of the Company's most important drug in its pipeline, Varubi.  Defendants further failed to implement proper internal controls to ensure the Company provided health care providers with material information about Varubi's safety and efficacy.  Additionally, the Individual Defendants failed to disseminate material financial information to the SEC and the investing public related the effect of healthcare providers returning Varubi due to concerns with its safe use.  These improper practices caused TESARO to incur substantial damage.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of TESARO, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage TESARO has already incurred, TESARO has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of TESARO, regarding the Individual Defendants' management of TESARO's operations and the safety and efficacy of the Company's most important drug in its pipeline, Varubi; and (ii) enhance the Individual Defendants' executive and directorial positions at TESARO and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused TESARO to issue improper financial statements.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning TESARO's operations, financial condition, and future business prospects.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing TESARO to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

42.     TESARO is a biopharmaceutical company focused on developing and commercializing oncology products for cancer patients in the U.S. and Europe.  Founded in March 2010, the Company in-licenses and develops internally its own oncology-related product candidates, including rolapitant, niraparib, and the product candidates under its immuno-oncology platform.

43.     In December 2010, the Company entered into a licensing agreement with OPKO to obtain an exclusive, royalty-bearing, sublicensable worldwide license to research, develop, manufacture, market, and sell rolapitant.  Upon signing the licensing agreement, the Company paid OPKO $6 million and issued to OPKO convertible preferred stock, valued at $600,000.  The Company made development milestone payments to OPKO totaling $30 million.  Further, under the OPKO license, TESARO must make milestone payments to OPKP of up to an aggregate of

$85 million, if specified levels of annual net sales of rolapitant are achieved.  The Company pays OPKO tiered royalties on annual net sales achieved in the U.S. and Europe at percentage rates from the low teens to the low twenties.

44.     TESARO did not have a commercially-available product until September 2015, when the Company began the marketing and sale of a rolapitant drug product named Varubi. Prior to the marketing and sale of Varubi, the Company was largely focused on raising capital and identifying, acquiring, and developing product candidates, undertaking preclinical studies and clinical trials, and manufacturing of product candidates.  As a result, the Company had recorded limited revenues from product sales.  Therefore, the Company was heavily reliant on the success of its first product, Varubi.

45.     Varubi is a long-acting NK-1 receptor antagonist for the prevention of chemotherapy-induced nausea and vomiting, or CINV.  The FDA approved Varubi initially in its oral form in combination with other antiemetic agents.  In October 2017, the FDA approved the intravenous formulation of Varubi.  In an October 25, 2017 press release, the Company asserted that "[w]ith a long plasma half-life of approximately seven days, a single dose of VARUBI, as part of an antiemetic regimen, significantly improved complete response (CR) rates in the delayed phase of CINV."

46.     In the October 25, 2017 press release, the Company also touted the IV version of Varubi as "a significant milestone for TESARO," with a majority of NK-1 receptors being administered intravenously in the U.S.  President and COO, defendant Hedley, claimed that "with the introduction of VARUBI IV, we now offer healthcare providers a unique, easy-to-use option that fits well into standard operating practices of a chemotherapy clinic or hospital."

- 17 -

47.     Varubi's initially reported side effects did not include anaphylaxis, anaphylactic shock, or other serious hypersensitivity reactions.   Instead, the Company only reported minor side effects, including decreased appetite, reduction in the concentration of white blood cells, dizziness, indigestion, and inflammation of the gums, lips, and mouth.

## IMPROPER STATEMENTS

48.     As detailed below, since at least March 2016, the Individual Defendants repeatedly misrepresented the safety profile and limited side effects associated with Varubi's use. In truth, as large cancer centers and community cancer networks reported to TESARO after the Company introduced Varubi IV into the market in November 2017, the drug caused anaphylaxis, anaphylactic shock, and other serious hypersensitivity reactions.   These serious, life-threatening side effects caused the Company to issue a letter to healthcare providers warning to be vigilant for signs of hypersensitivity or anaphylaxis in all patient receiving Varubi injectable emulsion during and following its administration.   The adverse reactions to Varubi IV also caused the Company to change the package insert for the drug, including modifications to the contraindications, warnings, and precautions, and adverse reactions sections.   The Company later admitted that the negative side effects jeopardized the Company's supposedly promising financial position and its ability to reach a broader market with Varubi.

49.     On March 14, 2016, TESARO issued a press release that touted the Company's submission of its NDA for the IV formulation of Varubi.   The press release, entitled "TESARO Submits New Drug Application for Intravenous Rolapitant to the U.S. Food and Drug Administration," omitted any discussion of possible adverse event reports of anaphylaxis, anaphylactic shock, and other hypersensitivity reactions requiring an update to its prescribing information.   The press release stated:

WALTHAM, MA, March 14, 2016 — TESARO, Inc. (NASDAQ: TSRO), an oncology-focused biopharmaceutical company, today announced that it has submitted the New Drug Application (NDA) for an intravenous (IV) formulation of rolapitant to the U.S. Food and Drug Administration (FDA).

Rolapitant is a substance P/neurokinin-1 (NK-1) receptor antagonist that is marketed in tablet formulation by TESARO in the United States under the brand name VARUBI®. The FDA approved VARUBI on September 1, 2015, for use in combination with other antiemetic agents in adults, for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.

"TESARO is committed to advancing new therapeutic options for patients with cancer, and the NDA submission for IV rolapitant represents a significant milestone for the Company," said Mary Lynne Hedley, Ph.D., President and COO of TESARO. "By developing an intravenous formulation of rolapitant, our goal is to provide oncologists additional flexibility in their choice of antiemetic regimens."

The NDA for IV rolapitant is supported by data from a clinical program that enrolled more than 400 subjects and included a bioequivalence study and several other supportive non-clinical and clinical studies. TESARO anticipates a standard 12-month review timeline for the IV rolapitant NDA.

50.     On May 6, 2016, TESARO filed its Quarterly Report on Form 10-Q for the first fiscal quarter ended March 31, 2016 with the SEC (the "Q1 2016 Form 10-Q"). Defendants Moulder and Pearson signed the Q1 2016 Form 10-Q. The Company reported a net loss of $90.8 million on revenue of $307,000, compared to a net loss of $48.5 million on zero revenue in the same quarter of the previous year. The Q1 2016 Form 10-Q omitted or failed to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

51.     Instead, the Q1 2016 Form 10-Q boasted about the efficacy of Varubi for treating chemotherapy induced nausea and vomiting, including the forthcoming IV formulation. The Q1 2016 Form 10-Q stated:

Rolapitant is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The

oral form of rolapitant, VARUBI, has been approved for commercialization in the
United States, and we are also developing an intravenous, or IV, formulation of
rolapitant.  In March 2016, we submitted a new drug application, or NDA, for IV
rolapitant to the FDA.  We also submitted a Marketing Authorisation Application,
or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in
March 2016.

52.     The Q1 2016 Form 10-Q contained certifications by defendants Moulder and

Pearson pursuant to sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") that the

Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the

Exchange Act.  Defendants Moulder and Pearson further certified that the report did not "contain

any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report."

53.     On August 5, 2016, TESARO filed its Quarterly Report on Form 10-Q for the

second fiscal quarter ended June 30, 2016 with the SEC (the "Q2 2016 Form 10-Q").

Defendants Moulder and Pearson signed the Q2 2016 Form 10-Q.  The Company reported a net

loss of $58.4 million on revenue of $36.8 million, compared to a net loss of $60.5 million on

zero revenue in the same quarter of the previous year.  The Q1 2016 Form 10-Q omitted or failed

to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock,

and other hypersensitivity issues to patients.

54.      Instead, the Q2 2016 Form 10-Q boasted about the efficacy of Varubi for treating

chemotherapy induced nausea and vomiting, including the forthcoming IV formulation.  The Q2

2016 Form 10-Q stated:

*Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist
for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The
oral form of rolapitant, VARUBI, has been approved for commercialization in the
United States, and we are also developing an intravenous, or IV, formulation of
rolapitant.  In March 2016, we submitted a new drug application, or NDA, for IV
rolapitant to the FDA which was accepted for review in May 2016, with a target

Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017.  We also submitted a Marketing Authorisation Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has validated.

55.     The Q2 2016 Form 10-Q contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

56.     On November 4, 2016, TESARO filed its Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2016 with the SEC (the "Q3 2016 Form 10-Q").  Defendants Moulder and Pearson signed the Q3 2016 Form 10-Q.  The Company reported a net loss of $101.2 million on revenue of $3.7 million, compared to a net loss of $66.6 million on revenue of $87,000 in the same quarter of the previous year.  The Q3 2016 Form 10-Q omitted or failed to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

57.     Instead, the Q3 2016 Form 10-Q touted the FDA's forthcoming approval of the IV formulation for Varubi and its ability to prevent nausea and vomiting in cancer patients on chemotherapy.  The Q3 2016 Form 10-Q stated:

On September 1, 2015, the Company's first commercial product, VARUBI® (rolapitant), was approved by the United States Food and Drug Administration, or FDA, in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The Company commenced sales of VARUBI during the fourth quarter of 2015.  In March 2016, the Company submitted a new drug application, or NDA, for intravenous rolapitant to the FDA which was accepted for review in

May 2016, with a target Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017. The Company also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has accepted for review.

58.     The Q3 2016 Form 10-Q also contained affirmations that Varubi was "potent and long-acting." Touting the efficacy of the drug, the Q3 2016 Form 10-Q stated:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, has been approved for commercialization in the United States, and we are also developing an intravenous, or IV, formulation of rolapitant. In March 2016, we submitted a new drug application, or NDA, for IV rolapitant to the FDA which was accepted for review in May 2016, with a target Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017. We also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has accepted for review.

59.     The Q3 2016 Form 10-Q contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act. Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

60.     On January 11, 2017, the Company issued a press release titled "TESARO Receives Complete Response Letter for Rolapitant IV from U.S. FDA." Defendants addressed the FDA's request for additional information in the course of the government agency's final review of the drug's in-vitro method to demonstrate comparability at the two proposed commercial manufacturers for Varubi IV included in the Company's New Drug Application. The press release asserted that "[t]he CRL did not identify concerns related to the safety or efficacy of rolapitant IV." The following day, on January 12, 2017, the Company held a

conference call for analysts and investors to discuss the FDA's issuance of a Complete Response

Letter for Varubi IV.  Defendant Hedley reassured analysts and investors that there were no

concerns over safety and efficacy of Varubi IV, stating:

> In the CRL, FDA requested additional information regarding the in-vitro method
> utilized to demonstrate comparability of drug product produced at the two
> proposed commercial manufacturers for rolapitant IV that were included in the
> NDA.  We are working expeditiously to provide the requested information.
>
> ***Importantly, the CRL did not identify concerns related to the safety or efficacy
> of rolapitant IV or request additional clinical studies.***  In addition, no questions
> were raised regarding the active pharmaceutical ingredient or API, which is also
> used for rolapitant oral product.

61.     On February 28, 2017, the Individual Defendants caused or allowed the Company

to file is Annual Report on Form 10-K for the fourth fiscal quarter and year ended December 31,

2016 with the SEC (the "2016 Form 10-K").  Defendants Moulder, Hedley, Pearson, Mott,

Alleva, Armitage, Collier, Nicholson, Oronsky, Patel, and Seidenberg signed the 2016 Form 10-

K.  For the quarter, the Company reported a net loss of $136.9 million on revenue of $4.2

million, compared to a net loss of $75.8 million on revenue of $230,000 in the same quarter of

the prior year.  For the year, the Company reported a net loss of $387.5 million on revenue of

$44.8 million, compared to a net loss of $251.4 million on revenue of $317,000 in the previous

year.  The 2016 Form 10-K omitted or failed to disclose that there were safety issues with Varubi

IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

62.     Instead, the Company touted the efficacy of Varubi and the FDA's forthcoming

approval of the drug's IV formulation.  The 2016 Form 10-K stated:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist
> for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The
> oral form of rolapitant, VARUBI, is approved for commercialization in the United
> States, and we are developing an IV formulation of rolapitant.  We submitted a
> new drug application, or NDA, for rolapitant IV to the FDA in March 2016.  In
> January 2017, the FDA issued a Complete Response Letter requesting additional
> information regarding the in vitro release method utilized to characterize the drug

product and demonstrate comparability of drug product produced by our two proposed commercial manufacturers of rolapitant IV that were included in the NDA. We will need to provide the additional requested information to the FDA in the form of a resubmission of the NDA, which the FDA will need to deem acceptable, in order for the NDA to be approved and for us to be allowed to market and sell rolapitant IV in the U.S. We also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016. In February 2017, the EMA's Committee for Medicinal Products for Human Use, or CHMP, rendered a positive opinion for our MAA for oral rolapitant, for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults.

63.     In the 2016 Form 10-K, the Company discussed its strategy, which included to supposed successful commercialization of Varubi. To accomplish this strategy, the Individual Defendants claimed that the Company would "leverage the experience and competencies of our [senior] management team to identify, acquire, and develop promising drug candidates and to commercialize cancer therapeutics that are potentially safer and more effective than existing treatments." Discussing the Company's specific strategy for Varubi, the 2016 Form 10-K stated:

> ***Successfully Commercialize Rolapitant for the Prevention of CINV.*** On September 1, 2015, our first commercial product, VARUBI, was approved by the FDA, for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy. We launched VARUBI in November 2015. Our rolapitant program also includes the development of an IV formulation, for which we submitted an NDA to the FDA in March 2016. We also submitted an MAA for oral rolapitant to the EMA in March 2016. Pending regulatory approvals, we intend to launch rolapitant IV in the U.S., and oral rolapitant in Europe, in the second half of 2017. We intend to establish rolapitant as part of the standard of care for the prevention of CINV in patients who, consistent with established treatment guidelines, could benefit from an NK-1 receptor antagonist, in addition to treatment with a 5-HT3 receptor antagonist plus a corticosteroid.

64.     The 2016 Form 10-K contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act. Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

65.     On May 9, 2017, TESARO filed its Quarterly Report on Form 10-Q for the first fiscal quarter ended March 31, 2017 with the SEC (the "Q1 2017 Form 10-Q").   Defendants Moulder and Pearson signed the Q1 2017 Form 10-Q.   The Company reported a net loss of $136.7 million on revenue of $3.1 million, compared to a net loss of $91 million on revenue of $300,000 in the same quarter of the previous year.   The Q1 2017 Form 10-Q omitted or failed to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

66.     Instead, the Q1 2017 Form 10-Q touted the FDA's forthcoming approval of the IV formulation for Varubi and its ability to prevent nausea and vomiting in cancer patients on chemotherapy.   The Q1 2017 Form 10-Q stated:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.   The oral form of rolapitant, VARUBI, is approved in the United States for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.   The European Commission also approved oral rolapitant for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults in April 2017.   We will market rolapitant in the European Union under the brand name VARUBY®.   We are also developing an intravenous, or IV, formulation of rolapitant. We submitted a new drug application, or NDA, for rolapitant IV to the United States Food and Drug Administration, or FDA, in March 2016.   In January 2017, the FDA issued a Complete Response Letter requesting additional information regarding the in vitro release method utilized to characterize the drug product and demonstrate comparability of drug product produced by our two proposed commercial manufacturers of rolapitant IV that were included in the NDA.   We resubmitted the NDA with such information to the FDA in April 2017, and the FDA will need to review and approve the resubmitted NDA in order for us to be allowed to market and sell rolapitant IV in the U.S.

67.     The Q1 2017 Form 10-Q contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

68.     On August 8, 2017, TESARO filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended June 30, 2017 with the SEC (the "Q2 2017 Form 10-Q").  Defendants Moulder and Pearson signed the Q2 2017 Form 10-Q.  The Company reported a net loss of $152.1 million on revenue of $29.5 million, compared to a net loss of $59.2 million on revenue of $35.8 million in the same quarter of the previous year.  The Q2 2017 Form 10-Q omitted or failed to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

69.     Instead, the Q2 2017 Form 10-Q touted the FDA's forthcoming approval of the IV formulation for Varubi and its ability to prevent nausea and vomiting in cancer patients on chemotherapy.  The Q2 2017 Form 10-Q stated:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The oral form of rolapitant, VARUBI, is approved in the United States for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The European Commission also approved oral rolapitant for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults in April 2017.  We market rolapitant in the European Union under the brand name VARUBY®, and commenced sales of VARUBY in May 2017 on a country-by-country basis.  We are also developing an intravenous, or IV, formulation of rolapitant. We submitted a new drug

application, or NDA, for rolapitant IV to the United States Food and Drug Administration, or FDA, in March 2016.  In January 2017, the FDA issued a Complete Response Letter requesting additional information regarding the in vitro release method utilized to characterize the drug product and demonstrate comparability of drug product produced by our two proposed commercial manufacturers of rolapitant IV that were included in the NDA.  We resubmitted the NDA with such information to the FDA in April 2017, and the FDA will need to review and approve the resubmitted NDA in order for us to be allowed to market and sell rolapitant IV in the U.S.  The target Prescription Drug User Fee Act action date is October 25, 2017.

70.    The Q2 2017 Form 10-Q contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

71.    On October 25, 2017, TESARO issued a press release announcing the FDA's approval of the IV formulation of Varubi.  In the press release, titled "TESARO Announces U.S. FDA Approval of VARUBI® IV for Delayed Nausea and Vomiting Associated With Cancer Chemotherapy," defendant Hedley called the development "a significant milestone for TESARO."  Defendant Hedley stated Varubi IV provided "a unique, easy-to-use option that fits well into standard operating practices of a chemotherapy clinic or hospital."  The October 25, 2017 press release stated:

WALTHAM, MA, October 25, 2017 — TESARO, Inc. (NASDAQ: TSRO), an oncology-focused biopharmaceutical company, today announced that the U.S. Food and Drug Administration (FDA) has approved VARUBI® (rolapitant) IV in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  Delayed nausea and vomiting can occur anytime between 25 and 120 hours following chemotherapy, and is often extremely debilitating.

VARUBI is a highly selective and competitive antagonist of human substance P/neurokinin 1 (NK-1) receptors, which play an important role in the delayed phase of chemotherapy-induced nausea and vomiting (CINV).   With a long plasma half-life of approximately seven days, a single dose of VARUBI, as part of an antiemetic regimen, significantly improved complete response (CR) rates in the delayed phase of CINV.   Results from three Phase 3 trials of VARUBI oral tablets demonstrated a significant reduction in episodes of vomiting or use of rescue medication during the 25- to 120-hour period following administration of highly emetogenic and moderately emetogenic chemotherapy regimens.     In addition, patients who received VARUBI reported experiencing less nausea that interfered with normal daily life and fewer episodes of vomiting or retching over multiple cycles of chemotherapy.   Results from a bioequivalence trial have demonstrated comparability of the IV and oral formulations of VARUBI.

\* \* \*

"The approval of VARUBI IV represents a significant milestone for TESARO. The majority of NK-1 receptor antagonist doses are administered intravenously in the U.S., and with the introduction of VARUBI IV, we now offer healthcare providers a unique, easy-to-use option that fits well into standard operating practices of a chemotherapy clinic or hospital," said Mary Lynne Hedley, Ph.D., President and COO of TESARO.   "We will continue our efforts to expand awareness of delayed chemotherapy-induced nausea and vomiting and plan to make this important medicine available next month."

"Many healthcare providers tend to believe that CINV is no longer an unmet need, but the reality is that more than half of patients treated with emetogenic chemotherapy experience delayed CINV, even when prescribed standard preventative therapies, such as a 5-HT3 receptor antagonist and dexamethasone," said Lee Schwartzberg, M.D., Professor of Medicine at University of Tennessee Health Science Center.   "The FDA approval of VARUBI IV gives doctors and nurses a new option to help protect their patients from these often preventable side effects."

72.     On November 7, 2017, TESARO filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended September 30, 2017 with the SEC (the "Q3 2017 Form 10-Q"). Defendants Moulder and Pearson signed the Q3 2017 Form 10-Q.  The Company reported a net loss of $25.3 million on revenue of $142.8 million, compared to a net loss of $87.9 million on revenue of $17 million in the same quarter of the previous year.  The Q3 2017 Form 10-Q omitted or failed to disclose that there were safety issues with Varubi IV causing anaphylaxis, anaphylactic shock, and other hypersensitivity issues to patients.

73.     Instead, the Q3 2017 Form 10-Q touted the FDA's forthcoming approval of the IV formulation for Varubi and its ability to prevent nausea and vomiting in cancer patients on chemotherapy.  The Q3 2017 Form 10-Q stated:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The oral form of rolapitant, VARUBI, is approved in the United States for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.   In October 2017, the United States Food and Drug Administration, or FDA, approved our new drug application, or NDA, for the intravenous, or IV, formulation of rolapitant.  We expect to commence sales of VARUBI IV in the U.S. in the fourth quarter of 2017.  The European Commission also approved oral rolapitant for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults in April 2017.  We market rolapitant in the European Union under the brand name VARUBY®, and commenced sales of VARUBY in May 2017 on a country-by-country basis.

74.     The Q3 2017 Form 10-Q contained certifications by defendants Moulder and Pearson pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Moulder and Pearson further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

## THE TRUTH SLOWLY EMERGES

75.     On January 12, 2018, the Company issued a press release titled "TESARO Announces Updates to the U.S. Prescribing Information for VARUBI® (rolapitant) Injectable Emulsion."  The Company reported that patients experienced anaphylaxis, anaphylactic shock, and other serious hypersensitivity reactions upon Varubi IV's introduction onto the market.  These are severe, potentially life-threatening allergic reactions to an antigen in Varubi, caused by

an overreaction of the patient's immune system, characterized by itchy rash, throat or tongue

swelling, shortness of breath, vomiting, lightheadedness, and low blood pressure.  The press

release specified:

> WALTHAM, Mass., Jan. 12, 2018 (GLOBE NEWSWIRE) -- TESARO, Inc.
> (NASDAQ:TSRO), an oncology-focused biopharmaceutical company, today
> announced that it has updated the VARUBI® (rolapitant) injectable emulsion
> package insert in collaboration with the U.S. Food and Drug Administration
> (FDA).   VARUBI injectable emulsion is a substance P/neurokinin (NK-1)
> receptor antagonist indicated for the prevention of delayed nausea and vomiting
> associated with chemotherapy in adults.  The changes to the labeling include
> modifications to the CONTRAINDICATIONS, WARNINGS and
> PRECAUTIONS, and ADVERSE REACTIONS sections.
>
> Following its introduction in late November 2017, TESARO estimates that at
> least 7,000 doses of VARUBI injectable emulsion have been administered to
> patients receiving emetogenic chemotherapy in the United States.  Anaphylaxis,
> anaphylactic shock and other serious hypersensitivity reactions have been
> reported in the post marketing setting, some requiring hospitalization.  These
> reactions have occurred during or soon after the infusion of VARUBI injectable
> emulsion.   Most reactions have occurred within the first few minutes of
> administration.

76.    The January 12, 2018 press release further revealed that the Company had issued

a DHCP letter to healthcare providers, warning them of the dangerous adverse effects associated

with the use of Varubi.  The press release continued, stating:

> Patient safety is a paramount priority for TESARO.   In its commitment to
> ensuring patients and healthcare professionals are aware of the label update,
> TESARO has issued a Dear Healthcare Professional (DHCP) letter.  This letter, as
> well as the updated full prescribing information, has been posted on the VARUBI
> website (www.varubirx.com).  Additionally, members of the TESARO field force
> will be calling on healthcare professionals to communicate this important new
> safety information.

77.    The DHCP letter itself, which TESARO issued the same day, notified healthcare

providers of the anaphylaxis, anaphylactic shock, and other serious hypersensitivity reactions

associated with the use of Varubi injectable emulsion.   The DHCP letter also prompted

prescribers to avoid providing Varubi to those with certain preexisting allergies.   The DHCP

letter stated:

> Dear Health Care Provider:
>
> The purpose of this letter is to inform you of important safety information for
> VARUBI® (rolapitant) injectable emulsion, a substance P/neurokinin (NK-1)
> receptor antagonist indicated for the prevention of delayed nausea and vomiting
> associated with cancer chemotherapy in adults.
>
> **Anaphylaxis, Anaphylactic Shock and Other Serious Hypersensitivity
> Reactions Associated with Use of VARUBI® (rolapitant) Injectable Emulsion**
> Anaphylaxis, anaphylactic shock and other serious hypersensitivity reactions have
> been reported in the post marketing setting, some requiring hospitalization.  These
> reactions have occurred during or soon after the infusion of VARUBI® (rolapitant)
> injectable emulsion.
>
> Most reactions have occurred within the first few minutes of administration.
> Symptoms of anaphylaxis can include wheezing or difficulty breathing; swelling
> of the face or throat; hives or flushing; itching; abdominal cramping, abdominal
> pain or vomiting; back pain or chest pain; hypotension or shock.
>
> **Prescriber Action**
>
> Healthcare professionals must be vigilant for signs of hypersensitivity or
> anaphylaxis in all patients receiving VARUBI® (rolapitant) injectable emulsion,
> both during and following its administration.
>
> It is advised that Healthcare professionals consult with patients to determine if the
> patient is hypersensitive to any component of the product (including soybean oil).
> Furthermore, as cross reactions to other allergens is possible, patients with known
> allergies to legumes or other related allergens should be monitored closely.
> Patients with a potential hypersensitivity should not be administered VARUBI®
> (rolapitant) injectable emulsion.
>
> Appropriate treatment should be available for immediate use in the event of an
> anaphylactic reaction during treatment with VARUBI® (rolapitant) injectable
> emulsion.
>
> If anaphylaxis or any other serious hypersensitivity/infusion reaction occurs,
>
>> • administration of VARUBI® (rolapitant) injectable emulsion should be
>> stopped immediately.
>>
>> • appropriate medical management (including epinephrine and or
>> antihistamines) should be initiated, and

• VARUBI® (rolapitant) injectable emulsion should be permanently discontinued.

**Important Prescribing Information**

The Prescribing Information has been updated to reflect the new safety information.

Other drugs should not be added to the VARUBI® (rolapitant) Injectable Emulsion vial until compatibility can be further evaluated.  Please refer to the Prescribing Information for additional information on Dosing and Administration.

78.     On this disappointing news, TESARO's stock plunged more than 5.8%, or $4.07 per share, on January 16, 2018, to close at $65.52 per share compared to the previous trading day's closing of $69.59 per share, erasing almost $221.3 million in market capitalization in a single day.

79.     It was not until February 27, 2018, more than a month later, that the full extent of the issues with Varubi and their effect on TESARO's financial prospects was finally revealed.  In a press release announcing TESARO's fourth fiscal quarter and full year 2017 operating results, the Company announced that "the market opportunity [for Varubi IV] is more limited than previously anticipated."  The press release stated:

> In January 2018, the package insert for VARUBI IV was updated to include mention of new adverse events, including anaphylaxis, anaphylactic shock and other serious hypersensitivity reactions, which were reported in the post-marketing setting following its introduction in late November 2017.  ***Given these dynamics, TESARO believes the market opportunity is more limited than previously anticipated, and will suspend distribution of VARUBI IV*** while continuing to support VARUBI oral tablets.  The Company is considering strategic alternatives for the product, including out-licensing, and will re-direct Company resources in support of ZEJULA.

80.     In the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, filed with the SEC (the "2017 Form 10-K"), the Company divulged that it had determined that it would cease marketing and distribution of Varubi IV.  Further, due to the serious side effects associated with Varubi's use, the Company revealed that it was considering

out-licensing the Varubi product line, including the oral formulation of the drug.  The 2017 Form

10-K stated:

> VARUBI® (rolapitant) is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The FDA approved VARUBI in oral formulation in September 2015 for use in combination with other antiemetic agents in adults for the prevention of delayed (24 to 120 hours after chemotherapy administration) nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The EC approved VARUBY®, the brand name of oral rolapitant in Europe, in April 2017 for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults.  The FDA approved the intravenous, or IV, formulation of VARUBI in October 2017.  In January 2018, after post-marketing reports of side effects experienced following the commercial introduction of VARUBI IV, we updated the VARUBI IV package insert, including modifications to the contraindications, warnings and precautions, and adverse reactions sections, and issued a "Dear Healthcare Professional Letter" to healthcare providers to highlight the updates.  ***In February 2018, we determined that we would cease marketing and distribution of VARUBI IV and pursue strategic alternatives for the VARUBI brand, including potentially out-licensing the VARUBI product line.***

81.     In the 2017 Form 10-K, TESARO acknowledged that as a result of the serious

hypersensitivity reactions associated with Varubi's use, the Company expected the vast majority

of its Varubi IV to be returned throughout 2018.   The 2017 Form 10-K stated:

> We launched the IV formulation of VARUBI in the U.S. in November 2017.  We offered significant launch discounts to our customers, which resulted in large purchases by several of our customers in the first few weeks of the launch.  In January 2018, after post-marketing reports of side effects experienced following the commercial introduction of VARUBI IV, we updated the VARUBI IV package insert, including modifications to the contraindications, warnings and precautions, and adverse reactions sections, and issued a "Dear Healthcare Professional Letter" to healthcare providers to highlight the updates.  As a result, we expect the vast majority of VARUBI IV units shipped to our customers in 2017 to be returned in 2018.  Due to the resulting significant reserve for returns, VARUBI IV net product revenue of $0.5 million (net of returns reserve of $24.8 million) was significantly lower than the gross revenue value of units that we shipped to customers during the fourth quarter of 2017.  In addition, we have recorded a write-down of VARUBI inventories, as further described below in "*Cost of Sales – Product*".

82.     According to the 2017 Form 10-K, the withdrawal and return of Varubi IV product to the Company had a significant financial impact, particularly a write-down to TESARO's cost of sales.  The aggregate write-down totaled $18.7 million.  The 2017 Form 10-K stated:

> *Cost of Sales - Product.*   Cost of sales of $1.2 million for the year ended December 31, 2016 (as revised) consists primarily of costs associated with the manufacturing of VARUBI and royalties owed to our licensor for VARUBI sales, as well as costs of product provided under our sampling and other commercial programs and certain period costs.  Cost of sales of $41.1 million for the year ended December 31, 2017 includes ZEJULA manufacturing costs and royalties, and to a lesser extent, VARUBI manufacturing costs and royalties from sales. ***The amount also includes a $16.7 million in lower of cost or market write-down for excess and obsolete VARUBI inventories.***  In addition, a $1.6 million loss on firm purchase commitments was also recorded as a component of cost of sales within the period.  Due to the update to the VARUBI IV package insert described above, we lowered our internal forecasts of future sales of VARUBI IV, and performed an analysis of the recoverability of our VARUBI inventories.  As a result of this analysis, ***we concluded that a significant portion of our VARUBI inventories was unlikely to be utilized in future product sales prior to expiration, and thus recorded the write-down as a component of cost of product sales***.  We accrued a $1.8 million royalty obligation as of December 31, 2016 related to the contractual minimum royalty commitment, and this amount was capitalized in the 'other assets' caption on the consolidated balance sheet, as we had concluded at the time that the shortfall would likely be recoverable through future years' sales.  ***Due to the revised forecast of future VARUBI sales described above, we concluded the royalty shortfall amount would no longer be recoverable through future years' sales, and wrote off $2.0 million as a component of cost of product sales.***

83.     With this revelation, TESARO's stock price plummeted more than 10%, from $61.55 per share on February 27, 2018 to $55.23 per share on February 28, 2018.  This astonishing loss of $6.32 a share represented a $344.8 million drop in market capitalization in a single day.

84.     In the wake of this sudden news, analysts cut their guidance expectations for TESARO.  In an article titled "Tesaro Dives As Biggest Moneymaker Lags and Another Drug Is Canned" published by Investor's Business Daily on February 28, 2018, the author noted that

"[a]nalysts were surprised by the decision" to suspend distribution of Varubi IV.  According to the article, Credit Suisse analyst Alethia Young removed expectations for $150 million in Varubi IV sales from her model, stating that "the company would need to do additional trials with a different formulation" of Varubi.  Similarly, Leerink analyst Seamus Fernandez eliminated any expectation of sales of Varubi IV from his model.

85.     Overall during this period, the Company's stock price fell more than 75%, from an artificial high of $190.36 per share on February 17, 2017, to $44.46 per share on May 30, 2018, a $145.90 a share loss in little over a year.  This loss marked a $7.3 billion market capitalization loss, and the stock price has yet to recover.

## THE FALSE AND MISLEADING 2016 PROXY

86.     On April 8, 2016, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg caused TESARO to file with the SEC its 2016 Proxy in connection with the 2016 Annual Meeting of Shareholders, held on May 11, 2016. Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg negligently issued materially misleading statements with respect to these solicited votes.  Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Material Misstatements in Support of Reelecting Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg**

87.     In the 2016 Proxy, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg solicited votes to reelect themselves.  In support of

their bid to reelect themselves, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg highlighted their supposed successful oversight of the Company.  The 2016 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations; (ii) the Audit Committee exercised oversight of the financial statements; and (iii) TESARO's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.

88.      In terms of the Board's oversight of risk, the 2016 Proxy stated on pages 6-7:

**Board's Role in Risk Oversight**

The board of directors believes that risk management is an important part of establishing, updating and executing on the Company's business strategy.  The board, both as a whole and at the committee level, has oversight responsibility relating to risks that could affect the corporate strategy, business objectives, compliance, operations, financial condition, and performance of the Company. The board focuses its oversight on the most significant risks facing the Company and on its processes to identify, prioritize, assess, manage and mitigate those risks.  The board and its committees receive regular reports from members of the Company's senior management on areas of material risk to the Company, including strategic, operational, financial, legal and regulatory risks. While the board has an oversight role, management has direct responsibility for managing and assessing risks and implementing processes and controls to mitigate their effects on the Company.

The board of directors carries out its oversight responsibilities in part through its committees.  The audit committee, as part of its responsibilities, oversees the management of financial risks, including but not limited to accounting matters, liquidity and credit risks, corporate tax positions, insurance coverage, and cash investment strategy and results.   The audit committee also oversees the management of risks relating to the performance of the Company's independent registered public accounting firm, as well as our systems of internal control over financial reporting and disclosure controls and procedures.  The compensation committee is responsible for overseeing the management of risks relating to our executive compensation and overall compensation and benefit strategies, plans, arrangements, practices and policies, and compensation of the board of directors. The governance and nominating committee oversees the management of risks associated with overall compliance and corporate governance practices, and the independence and composition of the board. These committees provide regular reports to the full board.

89.     Through these statements, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  In reality, the Board and Audit Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.   Rather, these Board members continually failed to address safety and efficacy issues with Varubi IV experienced by patients until January 2018.  Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg were negligent in including these misleading statements in the 2016 Proxy.

90.     Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg made these material misrepresentations above in the 2016 Proxy in support of a stockholder vote for reelecting themselves to the Board.  Numerous stockholders voted in favor of their reelection based on material misrepresentations about the Company's supposed risk management and internal controls over its financial reporting.  This harmed stockholders by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  Therefore, the 2016 Proxy solicitation was an "essential link" in the accomplishment of the harm-causing conduct.

**Material Misstatements in Support of a Vote to Approve an Amendment to the Director Incentive Plan**

91.     Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg also made material misrepresentations in the 2016 Proxy in support of a stockholder vote for approval of an amendment to the Director Incentive Plan to

increase the maximum of shares reserved for issuance under the plan to 500,000 to themselves. The aggregate value of the shares was approximately $22 million at the time of the filing of the 2016 Proxy.

92.     The stated purpose of the Director Incentive Plan was to "promote the best interests of the Company by enhancing the Company's ability to attract and retain highly qualified non-employee directors and by rewarding the Company's current non-employee directors for their services to the Company."

93.     The material terms of the performance goals in TESARO's Incentive Plan did not promote the best interests of the Company.  In reality, the material terms of the Incentive Plan actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices described herein, which furthered only short-term growth fueled by artificially inflated revenues and earnings while rewarding non-employee directors overseeing such endeavors.

94.     Under this false impression, numerous TESARO stockholders voted for the increase in shares for distribution under the Incentive Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address safety and efficacy issues with Varubi IV experienced by patients until January 2018.  In reality, the Incentive Plan only incentivized the continued risk-taking, illegal, and loss-generating corporate action described herein.  The proxy solicitation for a stockholder vote on the material terms of the performance goals in TESARO's Director Incentive Plan directly authorized harm to the stockholders.  Therefore, the 2016 Proxy was an "essential link" in the accomplishment of the harm-causing conduct.

## REASONS THE STATEMENTS WERE IMPROPER

95.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     Varubi IV was experiencing known but undisclosed serious hypersensitivity reactions in patients taking the drug, including anaphylaxis and anaphylactic shock;

(b)     the dangerous health risks associated with Varubi IV would cause the Company to cease marketing and distribution of the drug;

(c)     the Company was required to write down cost of product sales due to anticipated mass returns of Varubi IV;

(d)     the Company failed to maintain adequate disclosure controls and procedures with respect to TESARO's operations and financial standing; and

(e)     as a result of the foregoing, the officers' and directors' representations concerning Varubi and its prospects were improper.

## DAMAGES TO TESARO

96.     As a result of the Individual Defendants' improprieties, TESARO disseminated improper, public statements concerning the Company's business prospects, and the safety and efficacy of Varubi IV.  These improper statements have devastated TESARO's credibility as reflected by TESARO's almost $7.4 billion, or 75%, market capitalization loss.

97.     TESARO's performance issues also damaged its reputation within the business community and in the capital markets.  Health care providers, including medical doctors and specialists, are less likely to consider treatments by a company with a known history of

misrepresenting the safety and efficacy of its drug pipeline.  Further, the Company erodes investor confidence in its ability to produce viable drugs for commercial use when it cannot adequately determine and address issues of safety and efficacy in a drug before it reaches the market.  In addition, TESARO's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.   As a direct and proximate result of the Individual Defendants' actions, TESARO has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs incurred to suspend the distribution of and/or recover any inventories of Varubi IV;

(c)    costs incurred to investigate the wrongdoing internally; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to TESARO.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of TESARO to redress injuries suffered, and to be suffered, by TESARO as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  TESARO is named as a nominal defendant

solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.    Plaintiff will adequately and fairly represent the interests of TESARO in enforcing and prosecuting its rights.

100.    Plaintiff was a stockholder of TESARO at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current TESARO stockholder.

101.    The current Board of TESARO consists of the following ten individuals: defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, Seidenberg, and non-defendant Pascale Witz.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg Face a Substantial Likelihood of Liability for Their Misconduct**

102.    Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg are responsible for negligently made statements in the materially misleading 2016 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg does not protect them for violation of section 14(a) in the 2017 Proxy.  Accordingly, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg face substantial likelihood of liability, excusing demand.

103.    As alleged above, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg breached their fiduciary duties of loyalty by making improper statements in TESARO's press releases and SEC filings on behalf of the Company regarding

TESARO's business practices, operations, financials, financial prospects, and disclosure controls and procedures were truthful, accurate, and complete.

104.     Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg were responsible for reviewing and approving the Company's financial statements.  Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg breached their fiduciary duties of loyalty by causing or allowing the Company's press releases and SEC filing regarding Varubi IV, which presented undisclosed safety risks, including anaphylaxis, anaphylactic shock, and other hypersensitivity issues.  The drug was significantly less safe than defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg repeatedly represented it to be.  As a result, any demand upon defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg to bring suit against themselves or the Officer Defendants would be a useless and futile act.

105.     Defendants Alleva, Nicholson, and Seidenberg as members of the Audit Committee, reviewed and approved the improper statements and financial reports.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to TESARO's financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused or allowed these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Alleva, Nicholson, and

Seidenberg face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

106.    In violation of the Code of Business Conduct and Ethics, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg failed to exercise "the highest levels of integrity in service to patients, the medical community, colleagues and shareholders" when they caused, or allowed the issuance of materially false and misleading statements to the public and other violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws.   Thus, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg face a substantial likelihood of liability, rendering demand on them futile.

**Demand Is Excused as to Defendants Moulder, Hedley, Mott, Patel, and Seidenberg for Additional Reasons**

107.    Defendants Moulder and Hedley have had a long standing business relationship since at least 2003, lasting more than fifteen years.   According to an Ernst & Young 2017 Entrepreneur of the Year profile, defendants Moulder and Hedley established a relationship while Moulder was CEO of MGI Pharma, Inc. ("MGI Pharma"), and Hedley was CEO and co-founder of Zycos, Inc. ("Zycos"), a privately-held company focused on developing oncology and antiviral products.[5]   Defendant Moulder-led MGI Pharma acquired Zycos shortly thereafter for $50 million in cash.   On information and belief, defendant Hedley received a substantial buy-out for her share of Zycos, through the MGI Pharma merger.   Following the merger between MGI Pharma and Zycos, defendant Hedley assumed various executive positions at MGI Pharma

---

[5] E&Y Website, About Us, Entrepreneurship, Entrepreneur of the Year 2017, *Life Sciences and overall: TESARO*, dated 2017 https://www.ey.com/us/en/about-us/entrepreneurship/entrepreneur-of-the-year/us_eoy_2017-life-sciences, accessed June 11, 2018.

through 2008, including Executive Vice President, positions she obtained due to her relationship with MGI Pharma's CEO defendant Moulder.   In January 2008, Eisai Corporation of North America, Inc. ("Eisai") acquired MGI Pharma in a $3.9 billion cash tender offer.   Defendants Moulder and Hedley received substantial buy-outs from the merger between Eisai and MGI Pharma.   The following table shows the approximate compensation defendants Moulder and Hedley received from Eisai's acquisition of MGI Pharma:

| Defendant | Cash-Out From Shares Owned | Cash-Out from Accelerated Vesting of Equity Awards (Options, RSUs, and SARs) | Cash Payments Pursuant To Retention Agreements | Gross-Up Payments | Total |
|---|---|---|---|---|---|
| Hedley | $689,773 | $5,263,003 | $1,603,500 | $1,248,954 | **$8,805,230** |
| Moulder | $8,230,477 | $27,637,859 | $2,802,500 | $2,140,815 | **$40,811,651** |

108.    Defendants Moulder and Hedley worked together at Eisai from January 2008 until 2009.  In 2009, the pair then began working at Abraxis Bioscience, Inc. together through 2010. In 2010, defendants Moulder and Hedley moved on to co-found and self-fund TESARO together.  Defendants Moulder and Hedley's relationship working symbiotically for nearly fifteen years, and receiving substantial rewards through their mutually-beneficial business relationship, demonstrates that their close ties go beyond the scope of a normal business relationship.  This raises a reason to doubt that defendants Moulder and Hedley would sue each other.

109.    Defendants Mott and Patel lack independence from defendants Moulder and Hedley, due to beneficial business relationships with defendants Moulder and Hedley. Defendants Moulder and Hedley are the co-founders of TESARO, as well as the Company's CEO and COO, respectively. Defendant Mott is a General Partner, and defendant Patel is a Venture Partner, of New Enterprise Associates, Inc. ("NEA"), a global venture capital firm investing in technology and healthcare companies during a company's lifecycle.  NEA was

heavily involved in the initial funding of TESARO. NEA initially invested in TESARO's May 2010 Series-A financing round, and still lists TESARO as a current investment in its portfolio. Voting to initiate suit against defendants Moulder and Hedley will not only foreclose NEA from investing in any of defendants Moulder and Hedley's companies, but likely create a reputation within the biopharmaceutical start-up community that NEA is antagonistic to defendants Moulder and Hedley, and prevent even unaffiliated companies from allowing NEA to invest. Accordingly, defendants Mott and Patel will not vote to initiate litigation against defendants Moulder and Hedley.

110.    Defendants Moulder and Hedley lack independence from defendants Mott and Patel due to their mutually-beneficial business relationships. As stated, defendants Mott and Patel's venture capital firm NEA has provided significant funding to the Company, which defendant Moulder and Hedley co-founded. There is reasonable doubt that defendant Moulder and Hedley would vote to initiate litigation against defendants Mott and Patel because it would likely prevent NEA from investing in companies and investment opportunities that defendants Moulder and Hedley present to their venture capital firm, NEA, in the future.

111.    Defendant Seidenberg lacks independence from defendants Moulder and Hedley for similar reasons. Defendant Seidenberg is also very active in the highly competitive biopharmaceutical investment world. Defendant Seidenberg is a Partner in Kleiner Perkins Caulfield & Byers, LLC ("KPCB"), a venture capital firm specializing in investments in incubation, seed stage, early stage, growth capital, expansion capital, and later stage companies. KPCB was also an early investor in TESARO, investing in the Company's June 2011 Series-B financing round. KPCB continues to hold TESARO as an investment in its portfolio. As of March 31, 2018, entities affiliated with KPCB owned 2,187,740 shares, or 4% of all outstanding

common stock of TESARO.  Voting to initiate a suit against defendants Moulder and Hedley will not only foreclose KPCB from investing in any of defendants Moulder and Hedley's companies, but likely create a reputation within the biopharmaceutical start-up community that KPCB is antagonistic to defendants Moulder and Hedley, and prevent even unaffiliated companies from allowing KPCB to invest.  Accordingly, defendant Seidenberg will not vote to initiate litigation against defendants Moulder and Hedley.

112.    Defendants Moulder and Hedley lack independence from defendant Seidenberg due to their mutually-beneficial business relationships.  As stated, defendant Seidenberg's venture capital firm KPCB has provided significant funding to the Company, which defendant Moulder and Hedley co-founded.  There is reasonable doubt that defendant Moulder and Hedley would vote to initiate litigation against defendant Seidenberg because it would likely prevent KPCB from investing in companies and investment opportunities that defendants Moulder and Hedley present to her venture capital firm, KPCB, in the future.

113.    The principal professional occupation of defendants Moulder and Hedley, as CEO and COO respectively, is their employment with TESARO, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendants Moulder and Hedley lack independence from the remaining Board members defendants Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg, who face a substantial likelihood of liability, due to their interest in maintaining their executive positions at TESARO.  This lack of independence renders defendants Moulder and Hedley incapable of impartially considering a demand to commence and vigorously prosecute this action.

114.    Plaintiff has not made any demand on the other stockholders of TESARO to institute this action, since such demand would be a futile and useless act for at least the following reasons:

(a)    TESARO is a publicly held company with over 54.8 million shares outstanding and thousands of stockholders as of April 30, 2018;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg for Violation of Section 14(a) of the Exchange Act**

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg.  The section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

117.    Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were

contained in the 2016 Proxy.   The 2016 Proxy contained proposals to the Company's stockholders that they vote to reelect the members of the Board and approve the amendment of the Director Incentive Plan.   By reasons of the conduct alleged herein, defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg violated section 14(a) of the Exchange Act.   As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg to the Board and the apportionment of 500,000 shares to themselves under the Director Incentive Plan.   Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg's reelection and the incentives approved under the Incentive Plan led to the continuation of the wrongful practices described herein.

118.    Plaintiff, on behalf of TESARO, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg based upon the false and misleading 2016 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants owed and owe TESARO fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe TESARO the highest obligation of good faith, fair dealing, loyalty, and due care.

121.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within TESARO, and/or consciously failing to prevent TESARO from engaging in the unlawful acts complained of herein.

122.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) Varubi IV was experiencing known but undisclosed serious hypersensitivity reactions in patients taking the drug, including anaphylaxis and anaphylactic shock; (ii) the dangerous health risks associated with Varubi IV would cause the Company to cease marketing and distribution of the drug; (iii) the Company was required to write down cost of product sales due to anticipated mass returns of Varubi IV; and (iv) the Company failed to maintain adequate disclosure controls and procedures with respect to TESARO's operations and financial standing.    Accordingly, the Officer Defendants breached their duty of care and loyalty to TESARO.

123.    The Director Defendants owed TESARO the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper statements described herein.  The Director Defendants knew or were reckless in not knowing that: (i) Varubi IV was experiencing known but undisclosed serious hypersensitivity reactions in patients taking the drug, including anaphylaxis and anaphylactic shock; (ii) the dangerous health risks associated with Varubi IV would cause the Company to cease marketing and distribution of the drug; (iii) the Company was required to write down cost of product sales due to anticipated mass returns of Varubi IV; and (iv) the Company failed to maintain adequate disclosure controls and procedures

with respect to TESARO's operations and financial standing.   Accordingly, the Director Defendants breached their duty of loyalty to TESARO.

124.    The Audit Committee Defendants, defendants Alleva, Nicholson, Oronsky, and Seidenberg, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely, and utterly failed in their duty of oversight, and defendants Alleva, Nicholson, Oronsky, and Seidenberg failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, TESARO has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to TESARO.

126.    Plaintiff, on behalf of TESARO, has no adequate remedy at law.

## <u>COUNT III</u>

### Against the Individual Defendants for Waste of Corporate Assets

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of TESARO's disclosure controls and procedures, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in this improper course of conduct, which was continuous, connected, and ongoing throughout the relevant period.   It resulted in continuous, connected, and ongoing harm to the Company.

129.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers; and (ii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the securities class action lawsuits.

130.    As a direct and proximate result of these defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.  As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to TESARO.

132.    Plaintiff, on behalf of TESARO, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of TESARO.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to TESARO.

135.    Plaintiff, as a stockholder and representative of TESARO, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136.     Plaintiff, on behalf of TESARO, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of TESARO, demands judgment as follows:

A.     Against all of the defendants and in favor of TESARO for the amount of damages sustained by TESARO, as a result of the defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing TESARO to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect TESARO and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to TESARO's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's oversight of the safety and efficacy of drugs in its pipeline;

2.     a proposal to strengthen the Company's operational controls;

3.     a proposal to create a committee of independent TESARO directors that are tasked with monitoring the safety and efficacy of the Company's commercially-available drugs;

4.     a proposal to strengthen TESARO's oversight of its disclosure controls and procedures to ensure material information is adequately and timely disclosed to the SEC and the public;

5.     a proposal to strengthen the Company's controls over financial reporting;

6.      a proposal to strengthen the Board's supervision of operations, and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

7.      a provision to permit the stockholders of TESARO to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of TESARO has an effective remedy;

D.      Awarding to TESARO restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Directing the Company to set aside the vote for the election of Defendant Directors Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Patel, and Seidenberg, elected in the 2016 Proxy;

F.      Directing the Company to set aside the vote to amend the Director Incentive Plan, brought in the 2016 Proxy;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 29, 2018

HUTCHINGS BARSAMIAN
  MANDELCORN, LLP

**/s/Theodore M. Hess-Mahan**
THEODORE M. HESS-MAHAN
BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
E-Mail: thess-mahan@hutchingsbarsamian.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
JONATHAN D. BOBAK
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
           csmith@robbinsarroyo.com
           ssanders@robbinsarroyo.com
           jbobak@robbinsarroyo.com

Attorneys for Plaintiff

12689141